# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**PROSPERITY HANDS, LLC, ELOISE
JONES, and ROBERT JONES,**
        **Plaintiffs,**

    v.                                                               Case No. 15-C-0483

**STATE FARM FIRE & CASUALTY
CO.,**
        **Defendant.**

---

## DECISION AND ORDER

Prosperity Hands, LLC ("Prosperity") filed this action against State Farm Fire and Casualty Company. It alleges that State Farm breached an insurance policy and committed insurance bad faith when it denied its claim for property damage caused during an unusually severe rainstorm on April 19, 2013. Before me now is State Farm's motion for summary judgment. *See* Fed. R. Civ. P. 56.[1]

## I. BACKGROUND

Prosperity owned a building on North Teutonia Avenue in the City of Milwaukee. It purchased an insurance policy from State Farm that included property coverage for the building. The building has three street addresses and three storefronts. Prosperity operated a laundry and dry cleaning service out of the center storefront at 3737 North Teutonia Avenue. The building, which was built in 1925, has a ground floor and a basement. It has a flat roof that is slightly pitched to drain from the east side of the

---

[1] Prosperity's members, Eloise and Robert Jones, are also named as plaintiffs. However, because Prosperity is the sole named insured under the policy, the Joneses are not proper plaintiffs. Thus, I will dismiss them from the case, and in this opinion I will treat Prosperity as the sole plaintiff.

building to the west side. The first image below depicts the building's roof; the second depicts the front of the building, which faces east:





At the time of the rainstorm in April 2013, the roof of the building was between 20 and 30 years old and in need of repair. In February 2013, the Joneses hired a roofer, John Anderson, to examine the roof to determine the cause of a leak. Anderson examined the roof, found a small leak over the front door to the dry cleaning business, and repaired it. In the course of repairing this leak, Anderson repaired part of a parapet on the front/east side of the building. While he was on the roof, Anderson also noticed other problems, including areas of the roof that exhibited wind damage and that were potential leaks. Anderson Dep. at 25:16–26:5. In Anderson's opinion, these problems were severe enough to require that the entire roof be replaced down to the decking. Anderson Dep. at 39:1–41:4. Anderson thought it would cost between $75,000 and $100,000 to complete these repairs. Anderson Aff. ¶ 7. Anderson advised the Joneses to contact their insurance company about the condition of the roof in February 2013 to see if it would be willing to pay for the repairs. The record does not make clear whether the Joneses contacted State Farm about these issues before the storm on April 19, 2013, but in any event the roof was not replaced as Anderson recommended before then. During the storm on April 19, 2013, rainwater infiltrated the building through the roof and caused damage to the interior of the building and to property located inside the building.

After the storm, Anderson looked at the roof again.[2] He found that the condition of the roof was worse than it was in February 2013. According to Anderson, part of the

---

[2] I have been unable to determine when Anderson first observed the roof after the rain. In their proposed findings of fact, the parties agree that Anderson was on the roof with State Farm's representatives on March 27, 2014, almost one year after the rainstorm. *See* Def. PFOF ¶¶ 93–95 (undisputed); Pl. PFOF ¶ 10. However, Anderson states that he was on the roof after the rainstorm "twice." Anderson Aff. ¶ 2. It is unclear if the other visit was earlier than March 2014.

roof now had "dips" in it and also had broken apart at the seams. Anderson Aff. ¶ 8; Anderson Dep. at 28:12–28:16. Anderson also noticed that mortar had been "washed away" from between bricks in the building's front parapet. Anderson Dep. at 30:7–30:20.[3] The area from where the mortar had been washed away was more than two feet higher than the surface of the roof. *Id.* at 31:2–31:25. According to Anderson, when he was on the roof in February 2013, the mortar in the parapet was largely intact. *Id.* at 30:14–14:20.

It is Anderson's opinion that the damage to the roof and parapet he observed after the storm was caused by the storm. His theory is that, during the storm, the amount of rain that fell on the roof was so great that the roof could not drain it fast enough, and this resulted in more than two feet of water accumulating on the roof and against the front/east parapet. In Anderson's opinion, it was the weight of this huge body of water on the roof that caused it to dip and tear apart at the seams. Anderson Dep. at 28:12–28:22. Anderson also believes that this body of water rose up to the level of the top of the parapet—about two or three feet off the surface of the roof—and washed the mortar out from between the bricks. *Id.* at 30:1–32:7. Anderson opines that to repair the damage to the roof and parapet caused by the storm, not only would the entire roof need to be replaced (which he thought was necessary even before the storm), but also some of the joists and structural matter underneath the roof would have to be replaced, and the front parapet would need to be rebuilt. *Id.* at 45:1–46:6. Anderson opines that the cost of making these repairs would be between $300,000 and $400,000. Anderson Aff. ¶ 7.

---

[3] In his deposition, Anderson referred to the parapet as a "column." Anderson Dep. at 42:18–43:8.

According to State Farm, however, the storm did not cause any damage to the roof. Instead, because the roof was in a state of disrepair and prone to leaks at the time the storm hit, rainwater simply entered the building through existing holes and leaky areas. After Prosperity reported the damage to State Farm, it sent two claims representatives, Boedecker and Casnovsky, to inspect the premises. They looked for storm damage to the roof but did not find any. However, they did observe multiple defects in the roof that were due to long term normal wear and tear and lack of maintenance. Def. Proposed Findings of Fact ("PFOF") ¶ 54. These defects would allow rainwater to infiltrate into the building. *Id.* ¶ 55. Based on Boedecker and Casnovsky's determination that the storm did not cause damage to the roof, but instead water infiltrated the building through preexisting leaks, State Farm denied Prosperity's claim.

After State Farm's initial denial of the claim, Prosperity asked State Farm for another opinion on coverage. State Farm then retained an engineering firm, Building Envelope Consultants, Ltd., to inspect the building. This firm inspected the roof and concurred with State Farm's initial assessment, *i.e.*, that the storm did not cause any damage to the roof and that the rainwater that entered through the roof did so because the roof was in poor shape before the storm hit. The firm prepared a written report that stated in relevant part as follows:

> The subject roof was in a state of disrepair due to deferred maintenance, poor quality installation techniques and normal wear and tear. The roof is not salvageable but requires full removal and replacement as a result of its age and condition. The poor condition of the roof system was also directly responsible for the water infiltration which caused the discovered interior water damage to ceiling materials. The interior water infiltration and resulting damage to finish materials was a long term condition as evidenced by the previous repairs observed.

5

> . . . .
>
> There was no evidence to support a claim any single weather related event caused any damage to the building or its components to cause any of the observed conditions. The building requires extensive remedial action as a result of deferred maintenance.

Balistreri Decl. Ex. B at 5.

State Farm informed Prosperity of the results of Building Envelope's inspection. However, Prosperity continued to insist that the damage was covered by State Farm's policy. State Farm then offered to have Building Envelope perform a second inspection and confer with John Anderson about the roof. Representatives from Building Envelope met with Anderson on the roof of the building, but Anderson was unable to convince the engineers that the storm had caused damage to the roof. Thus, Building Envelope did not change its opinions, as expressed in its previous report. Ultimately, State Farm did not pay the claim.

Prosperity filed this suit against State Farm in state court, alleging that State Farm breached the insurance policy and also denied the claim in bad faith. State Farm removed the action to this court under the diversity jurisdiction, 28 U.S.C. § 1332, and eventually filed the present motion for summary judgment on all claims.

## II. DISCUSSION

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I take evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

The parties agree that Wisconsin substantive law applies to this case. Under Wisconsin law, to determine whether coverage exists under a policy, the court examines the facts of the insured's claim to ascertain whether the insuring agreement makes an initial grant of coverage. *State Farm Fire & Cas. Co. v. Acuity*, 280 Wis. 2d 624, 630 (Ct. App. 2005). If an initial grant is triggered, the court looks to see if an exclusion applies. *Id.* The plaintiff bears the burden of proving that the loss falls within the initial grant of coverage. *Brown v. Sandeen Agency, Inc.*, 316 Wis. 2d 253, 259 (Ct. App. 2009). If the plaintiff satisfies this burden, then the burden shifts to the insurer to prove that an exclusion applies. *Id.* at 259–60.

In the present case, the policy's initial grant of coverage provides as follows:

> We insure for accidental direct physical loss to Covered Property unless the loss is:
>
> 1. Excluded in **SECTION I – EXCLUSIONS**; or
> 2. Limited in the **Property Subject to Limitations** provision.

Decl. of Claude Covelli Ex. A; Policy at 4.[4] One part of the "property subject to limitations" provision is relevant to this case:

> 1. We will not pay for loss to:
>
> . . . .
>
>     e. The interior of any building or structure, or the property inside any building or structure, caused by rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

---

[4] The policy consists of declaration pages and various coverage forms. The only coverage form at issue in this case is the "State Farm Businessowners Coverage Form." In citing to the policy, I will use the page numbers on this form.

7

> (1) The building or structure first sustains damage by a Covered Cause of Loss to its roof, outside walls, or outside building glass through which the rain, snow, sleet, ice, sand or dust enters; or
>
> (2) The loss is caused by thawing of snow, sleet or ice on the building or structure.

*Id.* Because of this limitation, Prosperity cannot recover any loss to the interior of the building or its contents caused by rainwater entering the building unless it first proves that the storm on April 19, 2013, caused "accidental direct physical loss" to the building's roof or parapet. This means that if the roof and parapet had leaks in them before the storm, and during the storm rainwater simply infiltrated the building through those preexisting leaks (as State Farm contends), then the water damage to the interior of the building and its contents would not fall within the policy's initial grant of coverage. Thus, the first question raised by State Farm's motion for summary judgment is whether Prosperity has produced evidence from which a reasonable jury could conclude that the storm caused accidental direct physical loss to the roof. If it has, then the burden will shift to State Farm to show that a reasonable jury could not fail to conclude that the loss falls within one of the policy's exclusions.

The parties do not dispute the meaning of "accidental direct physical loss." Rather, they agree that, as applied to this case, the roof or parapet will have suffered an accidental direct physical loss if the storm caused damage to the roof or parapet.

In support of its claim that the storm damaged the roof and parapet, Prosperity relies entirely on the testimony of John Anderson, which it offers as expert testimony. As discussed in more detail above, Anderson observed the condition of the roof both before and after the storm, and he contends that the roof was in worse shape after the storm than before the storm. Specifically, after the storm, he observed that part of the

8

roof had "dips" in it and had broken apart at the seams. Anderson Aff. ¶ 8; Anderson Dep. at 28:12–28:16. Anderson also noticed that mortar had been "washed away" from between bricks in the building's front parapet. Anderson Dep. at 30:7–30:20. The area from where the mortar had been washed away was more than two feet higher than the surface of the roof. *Id.* at 31:2–31:25. According to Anderson, when he was on the roof in February 2013, the mortar in the parapet was largely intact. *Id.* at 30:14–14:20. Anderson opines that all this new damage was caused when more than two feet of rainwater accumulated on the surface of the roof during the storm: this huge body of rainwater both caused the roof to cave in in spots and washed the mortar out from the parapet.

State Farm contends that Anderson's opinion testimony is inadmissible under Federal Rule of Evidence 702. It notes that Anderson's entire basis for his opinion that the storm caused damage to the roof is his belief that more than two feet of rainwater pooled on the roof during the storm. State Farm contends that Anderson did not use sufficient facts or data or reliable principles and methods to determine that more than two feet of rainwater accumulated on the roof. State Farm also offers its own expert testimony from a meteorologist, who opines that no more than three inches of rain fell on the roof during the storm on April 19, 2013. *See* Decl. of Edward Hopkins, Ph.D ¶ 3. The plaintiffs do not dispute that no more than three inches of rain fell on the building. *See* Pls.' Resp. to Def.'s PFOF ¶ 125. Thus, argues State Farm, Anderson's contention that more than two feet of rainwater accumulated on the roof during the storm is untenable.

I agree with State Farm that Anderson's contention that more than two feet of rainwater accumulated on the roof during the storm is untenable. As the plaintiffs admit, no more than three inches of rain fell on the roof during the storm. No water drained onto the roof from higher elevations, and thus the only water that could have accumulated on the roof was the water that fell from the sky during the storm. The roof is unlike a city street or another area on the ground where, because of drainage from higher elevations, water could pool to a depth greater than the depth of the rain that fell from the sky. So, assuming that every drop of rain that fell on April 19, 2013 remained on the roof during the storm, the resulting body of water would have been no more than three inches deep. But of course not every drop of this rain remained on the roof. The roof sloped east to west to allow water to drain from the roof, and the west side of the building had drains. Moreover, the west side of the building had a parapet that was less than a foot high,[5] and thus even if the drains were completely obstructed, the rain would have begun to flow over the west side parapet long before the water reached a depth of two feet. Further, according to Anderson, the water on the roof reached a depth of more than two feet on the *east* side of the building, at the top of the slope, which would have been the area where the least amount of water pooled. There is simply no way that the rain would have been able to pool to a depth of even three inches in this area, much less to a depth of more than two feet.

In any event, Anderson does not identify any reliable methodology that he employed to determine that the rain pooled to a depth of more than two feet at the top of the slope. To the extent that he employed any methodology at all, it appears to have

---

[5] This can be seen in Photo 15 in Exhibit K to the Declaration of Claude Covelli.

10

involved comparing the roof's condition after the storm to his memory of the roof's condition before the storm.  That is, as far as Anderson can remember, the mortar in the parapet was largely intact in February 2013.  However, when he returned to the roof after the storm, the mortar in the parapet two feet above the surface of the roof was washed out.  Thus, reasons Anderson, the rain must have caused water to pool to a depth of more than two feet and wash the mortar out of the parapet.  The plaintiffs have not shown that this is the kind of methodology that an expert in the causation of roof damage would employ.  Nor can I imagine that such an expert would rely on this methodology.  In particular, I find that no expert would conclude that the storm caused more than two feet of rain to accumulate on the roof without identifying how it would be possible for that much rain to accumulate during a storm that produced no more than three inches of rain.  Thus, Anderson's opinion testimony is inadmissible.

Although Anderson's opinion testimony is inadmissible, his description of the condition of the roof both before and after the storm is admissible as ordinary fact-witness testimony.  And, as noted above, Anderson claims to have observed problems with the roof after the storm that were not present before the storm, namely, the washed-out mortar in the parapet and dips in the roof.  A question thus arises as to whether Anderson's observations concerning the roof's condition both before and after the storm are enough to raise a question of fact as to whether the storm caused damage to the roof and parapet.  I conclude that they are not.  The problem is that, once we exclude Anderson's opinion that more than two feet of water pooled on the roof, we are left with no plausible explanation for how the rainstorm could have caused the damage Anderson claims to have observed.  Prosperity does not contend that the

storm could have caused this damage by some other means. It does not, for example, suggest that wind-driven rain eroded the mortar from between the bricks in the parapet, or that three inches of rain could have caused the dips in the roof that Anderson noticed after the storm. And even if Prosperity made an argument along these lines, which it has not, it would have to support the argument with admissible expert testimony, as it is outside the knowledge of a lay juror to determine whether the storm on April 19, 2013 was capable of causing this damage. *See Menick v. City of Menasha*, 200 Wis.2d 737, 748 (Ct. App. 1995) ("Expert testimony is required to prove causation if the matter does not fall within the realm of ordinary experience and lay comprehension."). But Prosperity does not have any such expert testimony. Thus, on this record, a jury could not reasonably infer from the mere fact that Anderson observed new damage to the roof and parapet after the storm that the damage was caused by the storm.

Prosperity might argue that, besides the rain, there are no potential causes of the damage to the roof and parapet, and that therefore it would be reasonable for the jury to infer that the rain caused the damage. However, this argument assumes that the rain itself is a potential cause of the damage. As discussed above, Prosperity has not given a plausible account of how the rain could have caused the damage, and thus on this record the rain cannot be considered a potential cause of the damage. Prosperity might note that this means the record reveals no potential cause of the damage that Anderson observed. Although this is true, it is not a problem. If on this record no reasonable jury could identify the cause of the damage that Anderson observed, then the only reasonable inference the jury could draw would be that Anderson's testimony about having observed new damage after the storm is flawed. Perhaps the damage was there

in February 2013 and Anderson simply does not remember seeing it at that time. Prosperity might complain that I am not allowed to make credibility determinations at summary judgment but must instead accept Anderson's testimony that he observed new damage after the storm as true. But here I am not resolving an issue of Anderson's credibility but simply pointing out that, absent some plausible explanation as to how the rain caused the damage to the roof and parapet, or some other plausible explanation for how the roof and parapet were damaged after February 2013, the only reasonable inference is that Anderson's testimony about the condition of the roof before the rain fell is inaccurate. In other words, based on the present record, no reasonable person could believe Anderson's testimony about the condition of the roof before the storm. *See Seshadri v. Kasraian*, 130 F.3d 798, 802 (7th Cir. 1997) (noting that, at summary judgment, a court does not have to accept testimony as true if, in the circumstances, no reasonable person would believe it); *see also Melton v. Tippecanoe County*, 838 F.3d 814, 819 (7th Cir. 2016); *Winchester Packaging, Inc. v. Mobil Chemical Co.*, 14 F.3d 316, 319 (7th Cir. 1994).

In short, Prosperity has failed to produce evidence from which a reasonable jury could conclude that the loss it incurred on April 19, 2013 falls within the policy's initial grant of coverage. For this reason alone, State Farm is entitled to summary judgment. However, as explained below, even if a reasonable jury could conclude that the loss falls within the initial grant of coverage, the loss would fall within the policy's exclusions.

One of the policy's exclusions provides that the policy does not cover a loss "whether consisting of, or directly and immediately caused by one or more of the following." Policy at 6. The list of exclusions that follows includes "wear and tear." *Id.*

13

at 7.[6] Further, another exclusion states that the policy does not cover a loss "described" in the part of the policy that includes the wear-and-tear exclusion "regardless of whether one or more of the following: (a) directly or indirectly cause, contribute to or aggravate the loss; or (b) occur before, at the same time, or after the loss or any other cause of the loss." *Id.* at 8. The list that follows includes "weather conditions." *Id.* The effect of these provisions in the exclusions section of the policy is to exclude coverage for any loss caused by a combination of wear and tear and weather conditions. Thus, if on April 19, 2013 rainwater was able to enter the building because the roof and parapet were already worn out, any loss caused by the rainwater entering the building would not be covered.[7]

As discussed in more detail in the background section, above, the evidence in the record shows that, prior to the storm, the roof and parapet were worn out and in need of substantial repairs. The plaintiff's own witness, John Anderson, opines that the entire roof needed to be replaced down to the decking. Anderson also opines that if his

---

[6] An exception to the wear-and-tear exclusion states that if wear and tear "results in accidental direct physical loss by any of the 'specified causes of loss' or by building glass breakage, we will pay for the loss caused by that 'specified cause of loss' or by building glass breakage. Policy at 7. The policy defines "specified cause of loss" as "fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; 'sinkhole collapse'; 'volcanic action'; falling objects; weight of snow, ice or sleet; water damage." *Id.* at 22. "Water damage" is further defined as being limited to damage caused by burst plumbing and certain other accidents. *Id.* The plaintiff does not contend that the exception to the wear-and-tear exclusion applies.

[7] Another exclusion that is relevant but which I need not discuss in detail is an exclusion for "water." Policy at 5. As applied to this case, this exclusion would exclude coverage for any water damage caused by water entering the building from the ground or basement levels through inadequately sealed doors and hatches. Prosperity does not dispute that this exclusion would prevent coverage for water damage to the ground and basement levels caused solely by surface water seeping into the building through inadequately sealed doors and hatches.

recommended repairs would have been completed before the storm, the damage to the building that occurred during the rainstorm would have been prevented. Anderson Aff. ¶ 7 ("It is my opinion that the roof could have been repaired prior to the rainstorm at a cost of $75,000 to $100,000 and the damage to the building would not have occurred."). Thus, according to Prosperity's own evidence, but for the existing worn out state of the roof at the time of the storm, the storm would not have caused any damage to the roof or the rest of the building. Based on this evidence, a reasonable jury would be compelled to conclude that, assuming the storm caused any damage to the roof or parapet in the first place, preexisting wear and tear was also a cause of that damage and the loss to the rest of the building. Because the policy excludes coverage for a loss caused by a combination of weather conditions and wear and tear, it follows that the jury would be compelled to conclude that Prosperity's loss fell within the policy's exclusions. Accordingly, even if a jury could reasonably conclude that the storm caused damage to the roof and parapet (which, as I have determined, it could not), I would still have to grant State Farm's motion for summary judgment.

Finally, I note that because Prosperity's claim for breach of the insurance contract has failed, its claim that State Farm denied the claim in bad faith fails as well.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that State Farm's motion for summary judgment is **GRANTED**. The Clerk of Court shall enter final judgment.

Dated at Milwaukee, Wisconsin, this 1st day of February, 2017.

        s/ Lynn Adelman
        _____
        LYNN ADELMAN
        District Judge